the evidence, that the jury failed to give due weight thereto, and that the interests of justice require a new trial. The motion for a new trial, made upon the rendition of the verdict, should have been granted.

Judgment reversed, and new trial ordered, with costs to appellant to abide the event.

GERARD, J., concurs.

SEABURY, J. (dissenting). In my judgment the verdict of the jury, which the trial justice refused to set aside, should not be disturbed. The case presented simply an issue of fact, which was exclusively within the province of the jury to determine. Mr. Cahn, one of the plaintiffs, testified positively to his employment by the defendant, his successful efforts to secure some one willing to exchange his property for that of the defendant upon terms satisfactory to the defendant, and to the agreement on the part of the defendant to make the exchange. He was contradicted by the defendant, her husband, and their attorney. The issue of fact raised by this conflicting testimony was submitted to the jury in a charge that was fair and just to both parties. In common-law actions the verdict of the jury ought not to be treated as merely advisory, which may or may not be permitted to stand, dependent upon whether or not it coincides with the opinion of the trial justice or the justices of the appellate courts. The jury were the judges of the credibility of the witnesses. The evidence was such that the jury could logically and reasonably have come to the conclusion at which they arrived. Believing Cahn to be a credible witness, they could have come to no other conclusion. If the jury had returned a verdict which was logically impossible upon the evidence, a different situation would be presented.

. I think the judgment and order appealed from should be affirmed, with costs.

In re DALY, Commissioner of Public Works.

(Supreme Court, Appellate Division, Second Department. January 24, 1908.)

1. WATERS AND WATER COURSES—WATER RIGHTS—ABANDONMENT NOT SHOWN.

  Abandonment of a right to use, raise, and lower the waters of a lake running a mill was not lost, where the right was leased to and used by a city from 1870 to 1890, though it was not used for mill purposes, and the mill was allowed to become so wholly out of repair as to make its operation impossible without extensive repairs or practical rebuilding, and though from 1890 to 1893 no rent was received for the right and the mill was not repaired; it being apparent to the owners that the city must soon condemn.

  [Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 155.]

2. SAME—NONUSER—EFFECT.

  Mere nonuser of a water right does not show abandonment thereof. Facts and circumstances showing an intention to abandon must appear.

  [Ed. Note.—For cases in point, see Cent. Dig. vol. 48, Waters and Water Courses, § 155.]

3. EMINENT DOMAIN—WATER RIGHTS—AWARD—PERSONS NOT ENTITLED TO COM-
   PLAIN.
        In a proceeding by a city to condemn lands under a lake and a water
   right therein, the owners of the lands may not complain that the owners
   of the water right have been paid twice by the city for such right, on the
   theory that it was acquired in another proceeding.

4. SAME.
        Under the express terms of Laws 1893, p. 322, c. 189, § 11, title to a wa-
   ter right in a lake condemned by a city vested in the city when the com-
   missioners filed their oaths; and an award to the owners is not objection-
   able on the ground that the city has acquired the right under another pro-
   ceeding, in which the fee to the land to which the water right was appur-
   tenant was condemned, where the other proceeding was brought after the
   title to the right had so vested.

5. SAME—COMPENSATION—ADEQUACY.
        The right to take ice from a lake being appurtenant to ownership of the
   bed, an award to the owner for the land taken in a condemnation proceed-
   ing included compensation for the taking of that right; and an award for
   the taking of the rights of milling, of pondage, and to raise and lower the
   waters of the lake properly excluded compensation for the right to take
   ice.

Appeal from Special Term, Westchester County.

In the matter of the application and petition of Michael T. Daly, as
commissioner of public works of the city of New York, to acquire
land in connection with the city's water supply at Lake Gleneida.
From a part of an order of the Special Term confirming the commis-
sioners' report, certain claimants appeal. Affirmed.

Argued before WOODWARD, JENKS, HOOKER, GAYNOR,
and MILLER, JJ.

Lewis H. Freedman (Artemas H. Holmes and John J. Jones, Jr.,
on the brief), for appellants.

I. J. Beaudrias, for respondent city of New York.

Arthur M. Johnson, for respondent Cole.


HOOKER, J. This is a proceeding under chapter 189, p. 317, of
the Laws of 1893, and the acts amendatory thereof, for the condemna-
tion of certain property for the purpose of supplying water to the city
of New York. It was commenced on December 5, 1893, when com-
missioners, as provided in the act, were appointed. They filed their
oaths the following day, and proceedings were had herein, which re-
sulted in the filing of their fourth separate report on November 1,
1899. A motion to confirm it was denied at Special Term, and new
commissioners were appointed. The order was appealed from, and
was affirmed in this court. 72 App. Div. 394, 76 N. Y. Supp. 28. An
appeal to the Court of Appeals from the order of affirmance was dis
missed. 173 N. Y. 640, 66 N. E. 1106. The new commissioners qual-
ified on June 21, 1902. The survivors of these commissioners, with
substitutes made necessary by death, filed their report February 9, 1906.
It awarded for parcel No. 63, which will be described later, $6,900 to
the so-called Raymond heirs, and for parcel No. 64 $10 to the Ray-
mond heirs and $27,100 to the so-called Cole heirs. The Raymond in-
terests opposed the confirmation of the order; but it was confirmed,
and the Special Term refused to send the matter back to the commis-

sioners. The Raymond heirs appealed to this court; but the appeal was dismissed. 116 App. Div. 798, 102 N. Y. Supp. 22. The order of dismissal was, however, reversed by the Court of Appeals (189 N. Y. 34, 81 N. E. 560), and the award of the commissioners, as set forth in the report filed February 9, 1906, is now before us for review upon the merits.

The Raymond heirs filed a claim to the award of $27,100 to the Cole heirs, and after they appealed from the order of confirmation the city deposited the amount of the award in the depository designated in the order, as there directed in case of adverse and conflicting claims. They have refused to accept the award of $10 to them, and that sum the city likewise deposited. The dispute is as to these two awards. The description of so-called parcel No. 63 was of land under the waters of Gleneida Lake. The description of parcel No. 64 was:

 "All rights of milling, all rights of pondage, and all rights to raise and lower the waters of Lake Gleneida, town of Carmel, county of Putnam, are intended to be included in this parcel."

The Raymond heirs were the owners of the land under the waters of Gleneida Lake, and were awarded therefor the sum of $6,900, which they have accepted and received. The interest of the Cole heirs is more complex. Some 200 to 500 feet below the lake the Cole heirs owned about 23 acres of land on the outlet, upon which was situated a mill and mill seat. The 23 acres itself was not taken in this proceeding, not delineated on the map, nor described in the petition upon which the proceeding was based. In 1811 the lake and a large area of land around it, including the mill, was owned by Mary Gouverneur who in that year conveyed to one of the predecessors in title of the Cole heirs this 23 acres of land, upon which stood the mill, together with "the privilege of the water of the lake." The lake or pond was of about 180 acres. It is fair to assume that at that time the lake was used as a reservoir for the mill, for it appears that continuously for a long period of years immediately before 1870 it was so used; the waters being controlled by a dam, gate, or flume at the very outlet of the lake, and the proprietors of the mill asserting the right to raise and lower its waters, and actually doing so as far back as the memory of living witnesses goes. The right in the owner of the mill to flood the lake to high-water mark and to draw off water down to the bottom of the flume seems never to have been questioned, at least while the mill was being operated. The distance between these two levels of the water was approximately 4 feet 10½ inches.

The appellants, the Raymond heirs, attack the award to the Cole heirs for parcel 64 upon the ground that any easement the latter or their predecessors in title had was abandoned and destroyed long prior to the institution of this proceeding, and urge that the leases to the city since 1870 have worked that abandonment. The mill was in continuous operation down to 1870, and on August 24, 1870, it was leased to one Tracy, who assigned to the mayor, aldermen, and commonalty of the city of New York, "together with all the right, title, and interest of the party of the first part in and to Shaw's Pond, now called Lake Gleneida, and the waters thereof, and the use of the same, with the

right to repair, renew, and improve the dam or bulkhead and outlet of the said pond, as fully as the party of the first part has power and control over the same." The lease was for five years, at an annual rental of $2,000, and granted the right to purchase at any time within one year at the price of $30,000. Again, on August 24, 1875, the then owner leased direct to the city the same premises for a further term of five years at the annual rental of $1,500. On August 24, 1880, the then owner leased to the city "all the right, title, and interest of the party of the first part in and to Shaw's Pond, now called Lake Gleneida, and the waters thereof and the use of the same, with the right to repair, renew, and improve the dam or bulkhead and outlet of the said pond, as fully as the party of the first part has power and control over the same." This lease was for five years, at the annual rental of $1,200. On August 24, 1885, the then owner leased to the city the same premises described in the lease of 1880 for five years at the same rental. The lease was not renewed in 1890, and this proceeding was begun in December, 1893. Between August 24, 1890, and December, 1893, the mill was not operated, and at that time it was so wholly out of repair as to make its operation impossible without extensive repairs or practical rebuilding.

The appellants' claim on this branch of the case cannot be sound. Granting that between 1870 and 1893 the waters of the lake were not actually used for mill purposes, yet there was not only no evidence of purpose to abandon the water right, but, on the contrary, the intent of the proprietors to maintain and conserve the right was apparent. The leases of 1870 and 1875 were of the mill and the water right; those of 1880 and 1885, of the water right alone. The city may not have used the mill, as such, but did use the water, and raised and lowered its level. That is just what had been done by the operators of the mill. More than that, it is to be remembered that mere nonuser does not create an abandonment of an easement of this character. There must be on the part of the owner of the easement facts and circumstances showing an intention to abandon. Welsh v. Taylor, 134 N. Y. 450, 31 N. E. 896, 18 L. R. A. 535. There was a lease here of 10 years, between 1870 and 1880, of the mill and water right for a valuable, substantial consideration. Certainly the proprietor did not intend during that time to abandon what right he had in the waters of the lake, and it is impossible to conceive that he would ever entertain such a notion so long as he was obtaining from the lessee from year to year a substantial rental for the right. Nor was the mill removed. It is true it was not kept in repair; but why go to the expense of repairing it, while there was likelihood of a continuation of a large revenue without the necessity of such repairs. There is nothing in the case to show that the business of milling could not have been resumed upon a refusal of the lessee to renew, as soon as the mill structure and machinery might be rehabilitated. That between 1890 and 1893 no rent was received and the mill not repaired does not point to an intention to abandon; for it was entirely apparent to the owners that the city must soon condemn, and there is some evidence that they were so informed by city officials.

The appellants also urge that any right which the Cole heirs had in this lake was not taken by the city in this proceeding, but rather was taken when it obtained title, through condemnation proceedings, of the 23-acre mill site. I am unable to comprehend how the appellants have any interest in the question whether the Cole heirs have been paid twice for their property. The question might be highly important to the city; but it has not appealed. However, I think there is a more satisfactory answer to the contention. It is provided in section 11, c. 189, p. 322, of the Laws of 1893, the act under which this proceeding was brought, that the title to the land described in the petition should vest in the city absolutely upon the filing of the oaths of the commissioners. Such oaths were filed in this proceeding on December 6, 1893, and the water rights of the Cole heirs were described in the petition as parcel 64. While the owners were not mentioned by name, it is entirely clear that these rights were intended; for the description of parcel No. 64 was all rights of milling, pondage, and to raise and lower the waters of the lake. There is no proof in the record that any one other than the Cole heirs had or asserted any such right, and their claim to such right was known; for it was what the city had been paying rent for during 20 years. The easement was therefore extinguished with the filing of the oaths of the commissioners on December 6, 1893; and such title to the easement as could passed to the city on that day. The 23 acres on which the mill stood were not described in the petition, nor set forth on the map; and hence the fee thereto was unaffected by this proceeding, except that the water rights appurtenant thereto were extinguished.

The fee to the 23-acre piece has, however, been acquired by the city in another condemnation proceeding, known as "Reservoir D proceeding," and the appellants' point lies in the assertion that the latter proceeding antedated this one, and that when the fee of the 23-acre piece passed to the city in the Reservoir D proceeding, the water easement, for which the Cole heirs have been awarded $27,100 in this proceeding, passed with it as appurtenant. The trouble is that there is no satisfactory proof that the Reservoir D proceeding antedated the present one. It seems that the Reservoir D matter was begun by consent upon stipulation; but as late as July 27, 1895, we find that that proceeding was by order discontinued, the effect of which must have been to set at naught all that had been accomplished by it, including, of course, the acquirement of titles by the city. Counsel for the respondents admitted on the hearing now under review, for the purpose of this proceeding, that title to the 23-acre piece vested July 12, 1894; but that does not aid the appellants, for the date is yet over seven months later than the vesting of title in this proceeding. Upon this point it is quite clear to me that the easement of the Cole heirs in the waters of Lake Gleneida was extinguished on December 6, 1893, on the filing of the oaths of the commissioners in this proceeding, and the title to the actual 23-acre piece did not vest in the city until some time later. What the Cole heirs were awarded, and have accepted in the Reservoir D proceeding, must therefore have been for the land, shorn of this water right. In addition to all this, it is shown by the

record that upon the hearing in the Reservoir D proceeding both parties, namely, the city and the Cole heirs, proceeded upon the theory, which that commission adopted, that the claim of the Cole heirs for the value of the easement was before the commissioners in this proceeding, and was therefore not considered in that.

There remains another point, presented by the appellants, which should be considered. They assert that the award of $10 to them for parcel 64 is inadequate, and point to the evidence in the record that their right to cut and harvest ice was exceedingly valuable. I have no doubt it was; but in my view of the case they have had a substantial award therefor, in connection with parcel 63. It is to be recalled that the description of parcel 64 was rights of milling, of pondage, and to raise and lower the waters of the lake. The right to take ice had nothing to do with what is very evidently meant by this description. The ice privilege was appurtenant to the ownership of the bed of the lake, and the bed of the lake is described in parcel 63. From the record it seems to me the commissioners took into account the advantage of the right to harvest ice when they fixed the appellants' damage to that parcel.

I advise the affirmance of the order appealed from, with costs. All concur.